184 So.2d 839

**Joe Earl ROUSE**

v.

**STATE.**

3 Div. 174.

Court of Appeals of Alabama.

March 29, 1966.

Howard & Dunn, Wetumpka, for appellant.

Richmond M. Flowers, Atty. Gen., and Carol F. Miller, Asst. Atty. Gen., for the State.

CATES, Judge.

This appeal was submitted December 10, 1964.

Rouse appeals from a conviction of failing to support his child, contrary to the form of statute (Code 1940, T. 34, § 90 [1]).

---

[1] "§ 90. Any husband who shall, without just cause, desert or wilfully neglect or refuse or fail to provide for the support and maintenance of his wife; or any parent who shall without lawful excuse desert or wilfully neglect or refuse or fail to provide for the support and maintenance of his, or her, child, or children, under the age of eighteen years, whether such parent have custody of such child, or children, or not, she or they being then and there in destitute or necessitous circumstances, shall be guilty of a misdemeanor and, on conviction thereof, shall be punished by a

After judgment on verdict, the trial judge sentenced Rouse to hard labor for the county for twelve months.

The entry continues:

"It is further considered and ordered by the Court that this sentence is suspended conditioned upon the defendant paying the sum of $20.00 every two weeks to the Domestic Relations Division of the Circuit Court of Montgomery County for the support of said minor child, first payment to be due June 5, 1964 and that he further be required to pay $5.00 monthly to Dr. Charles Crook for dental services until the sum of $125.00 is paid.

"And the said defendant gives notice of appeal from the judgment and sentence of the Court to the Court of Appeals of Alabama and bail in said cause is fixed at the sum of $500.00, and that pending appeal the defendant is required to make the regular payments for the support of the child and $5.00 monthly to Dr. Charles Crook, until dental bill of $125.00 is paid, pending said appeal."

### I.

This case began with Rouse's arrest in September, 1963, on a defective warrant.

However, on Rouse's making a jury demand, the cause was taken from the Domestic Relations Division to the Criminal Division. There a solicitor's complaint was filed and issue taken on Count II thereof. No point was made of the deficiency of the original complaint.

### II.

The State's proof tended to show that Rouse in 1948 married a fifteen year old girl who in 1949 bore a son. The couple dissolved their union in an uncontested suit in the Elmore Circuit Court in which Rouse was the complainant. The ground was voluntary abandonment.

Rouse and his former wife had agreed that she would be wholly responsible for the support and maintenance of the child. The agreement was ratified in the final decree rendered May 8, 1950. Also, an independent paragraph of the decree provided:

"That the complainant, Joe Earl Rouse, is not required to pay alimony, maintenance, or support to the said defendant or the said child."

We paraphrase from the appellant's brief:

Myrlene Rouse McDowell testified that she was married to Rouse in July of 1948, she being then fifteen years of age; that she lived with him about six months; that they separated in January of 1949; and Michael Rouse was born in August of 1949. About five months after the divorce, she and the son moved to Kentucky and stayed eleven years.

Myrlene said that she and the boy moved back to Alabama two and one half or three years ago, and that recently the boy asked Rouse for help concerning braces for his teeth. Rouse never contributed one cent for the support of her son and never paid anything for the braces, but that she was paying for them.

She signed an agreement which released Rouse from any support of the child and therein she agreed to be wholly responsible for its support and maintenance. This agreement was approved and incorporated into the divorce decree which also specifically relieved Rouse of any obligation of support and decreed that the support of the child was on its mother.

Rouse obtained the divorce from her on the ground of voluntary abandonment. She was represented by a Guardian ad Litem on the divorce.

Shortly after the divorce, Myrlene married a Mr. Sims and lived with him eleven

fine of not exceeding one hundred dollars, or be sentenced to a term in the county jail, or at hard labor for the county for a

period of not more than twelve months, or the fine may be in addition to either the sentence to jail or to hard labor."

years and the child called Sims daddy. She is now married to a Mr. McDowell and they live in Montgomery. She has supported and cared for the child; he was not actually in need of food or clothing and not destitute. Her average income at the time the warrant was sworn out was $60.00 per week.

Mrs. Tom Holmes testified that she went to see Rouse about fixing Mike's teeth. Rouse refused.

Michael Rouse testified that he had not had enough to eat and had not had sufficient clothes; that he asked Rouse to see about getting his teeth straightened and that he promised to do so but never did.

Rouse moved to exclude the State's evidence on the ground that a prima facie case had not been made. The court denied the motion.

The State, in brief, has added the following:

Mrs. Holmes testified that Rouse had bought the child clothing; had given the child his (Rouse's) picture; and had promised to have the child's teeth fixed. She also testified that the child had been in necessitous circumstances since he had been living in Montgomery.

Michael Rouse testified as to his lack of sufficient food and clothing, and that he had been unable to go to school for lack of shoes:

"Q Now, Mike, tell this jury over there if or if not you ever had to go to school with holes in your pants?

"A Yes, sir.

"Q Why?

"A I didn't have any money to get any.

"Q Tell this jury over there whether or not you were ever picked up for not going to school and you couldn't go because you didn't have shoes and you were ashamed to go?

"A Yes, sir. It was last summer. Well, just before school was out."

On cross:

"Q Now, when you were living with your mother at this time, she wouldn't give you enough to eat, would she?

"A Well, she gave me what we had.

"Q That wasn't enough though, was it?

"A No, sir.

"Q You were hungry lots of times, weren't you?

"A Yes, sir.

"Q And you didn't have any clothes to wear.

"A I had clothes but they wasn't the best."

Rouse testified that his present income from his civil service job was $158.00 net every two weeks, and that he also receives military retirement pay.

### III.

At the request of the State[2] the trial judge gave the following written charge to the jury:

"I charge you that the presumption of legitimacy is one of the highest known to the law and not to be overcome except upon the highest proof."

Undoubtedly, this language is taken, virtually ipsissimis verbis, from this court's explication of the presumption against

2. Birt v. State, 156 Ala. 29, 46 So 858: "There were requested in behalf of the state upwards of 20 special charges. In these it was attempted to state numerous phrases (sic) ["phases" in So.Rep.] of the law conceived to be applicable to the cause. The safer practice in criminal prosecutions is for the state to sparingly, and then only when the ground is plain, exercise the privilege of asking special instructions by the court. * * *"

bastardy developed in Franks v. State, 26 Ala.App. 430, 161 So. 549.

But, even a correct text out of context is capable of distorting meaning.

So here we find the use of a legal concept which, in the succinct form used, states only a generality and omits the proper and necessary exceptions that round out the complete principle.

Rouse's counsel aptly argues:

"Appellant confesses that he has been unable to find a case where any such charge has been held either bad or good. However a charge of non-support is a criminal case and the burden of proof is on the State to prove guilt beyond a reasonable doubt, Sellers v. Sellers, 212 Ala. 290, 102 So. 442. Therefore, Appellant contends that the above charge is bad for the following reasons:

"1. It misplaces the burden and degree of proof.

"2. It invades the province of the jury.

"3. It is argumentative.

"4. It conflicts with the presumption of innocence in a criminal case.

"5. It is misleading and gives the jury no measure by which to determine the case or any issue therein.

"6. It is abstract.

"There is no difficulty in finding cases holding charges bad for each of the above reasons, but Appellant has been unable to find a case where a charge similar to the above was given. Of course it is a familiar rule that it is often improper to charge a jury by quoting from a decision in a case, Gray v. Anderson, 241 Ala. 154, 1 So.2d 384; Britling Cafeteria v. Irwin, 229 Ala. 687, 159 So. 228. Often such quotation from a decision in one case is abstract in another case. In this case, the charge does not instruct the jury how to apply any law to the facts in this case. There is no way a jury can tell what the highest proof is.

"Furthermore, it is strictly up to the jury what proof they will accept and which they will refuse. It invades the province of the jury and is argumentative to tell them that legitimacy cannot be disproved except upon the highest proof. In view of the facts in this case, such charge is highly prejudicial."

The State cites in rebuttal *Franks*, supra, and the perfervid opinion of the younger Mayfield, J., in Arthur v. Arthur, 262 Ala. 126, 77 So.2d 477.

The defendant adduced some testimony (albeit weak), the tendency of which might have supported an inference that he was not the child's father.

█  Hence, the granting of the State's charge, supra, was probably prejudicial to the jury's considering the whole of the evidence in the light of the presumed innocence of the defendant. Therefore, the harmless error rule (Sup. Ct. Rule 45) would not apply, and the giving of the State's requested charge was reversible error.

## IV.

In view of the reversal, we comment on the following matters so as to clarify rulings below in the event of another trial.

The decree of the Elmore Circuit Court not only approved the agreement of the husband and wife as to custody and support, but also expressly exonerated the husband from supporting the child. See Anno. 73 A.L.R.2d 960.

"When the parties to a divorce enter into an agreement with respect to alimony and maintenance to be allowed by the decree, and when the decree of divorce adopts that agreement as a feature of it, the agreement thereby becomes merged in the decree. It ceases to operate as an agreement, but the decree is effective as any other decree which would contain those terms whether or not there was an agreement to that effect. * * *

"The logic of that situation is, as declared by those cases, that the court will not modify such agreed decree except on proof of changed conditions which justify the modification and only to the extent of such changed conditions."—Callen v. Callen, 257 Ala. 226, 58 So.2d 462.

Our nonsupport statute stems from the Uniform Desertion and Nonsupport Act, 10 U.L.A. § 1; Act No. 498, September 16, 1915; Act No. 181, February 18, 1919; Code 1940, T. 34, § 90, supra.

Through the vicissitudes of amendment and codification, the enactment has retained the here pertinent elements. These requisites, all of which the State must (under § 90, supra) prove beyond a reasonable doubt, are:

(1) the relationship of parent and child, the latter being under eighteen;

(2) wilful, etc., nonsupport; and

(3) the child is in destitute or necessitous circumstances.

■ We consider that a court of equity, even though its decree has become final, cannot be ousted by the complainant and respondent parents in the divorce suit from entertaining a subsequent petition looking toward the support of a minor child.

In State v. Worthington, 227 Ala. 204, 149 So. 709, this court was reversed by the Supreme Court on a construction of Code 1940, T. 34, § 90, supra, wherein it was pointed out that § 90 was intended as a criminal action by the State against the parent in contradistinction from a contract status between mother and father arranged in a divorce suit.

It would thus appear that § 90, supra, is intended to provide the minimum standard for all children without regard to the station in life of the parents. That is, that it is a misdemeanor to allow a child to fall into destitute or necessitous circumstances. St. John v. State, 22 Ala.App. 115, 113 So. 321.

However, in the record of instant concern, there is but scant evidence from which the rational mind could infer destitution or need.

There was no proof whatsoever of the necessity for dental braces for the child nor was there any testimony as to the customary charges in the community for the services involved. Birmingham Amusement Co. v. Norris, 216 Ala. 138, 112 So. 633, 53 A.L.R. 840.

As to the lack of shoes, this came about in an exceedingly casual reference by the child to the fact that his truancy was due to his shame of being seen by his school mates unshod; this, apparently, in the latter part of May or early June.

There was no showing of an effective demand upon the father for shoes. While there was some testimony that the father had promised to obtain the dental work, yet no evidence came in to show that the father was given a reasonable opportunity to find a dentist of his own choosing to examine the boy and treat him if he were in fact in need of therapy.

There was no testimony of the expenses of either the wife or of the husband. The references to their respective incomes were wholly vague.

■ It is to be noted that the statute does not distinguish between mother or father and in this case we think that the showing by the defendant of the divorce decree wherein the mother agreed to support the child was prima facie a refutation of wilful neglect on his part.

No attempt was made to show that the wife petitioned the Circuit Court of Elmore County to modify the agreement or that any emergency required the father immediately to take care of the child upon default of the mother.

■ As between the parties, such an agreement would have validity, though it could not be used by the father as a bar to

his supporting the child in the event the mother was unable or refused to support it as she might have agreed to do.

In Jones v. State, 159 Tex.Cr. 18, 261 S. W.2d 324, we find:

"As pointed out in the Freeman case [103 Tex.Cr.R. 428, 280 S.W. 1069], and recognized in Gostick v. State [110 Tex.Cr.R. 282, 8 S.W.2d 167], the divorce decree and award of custody would not deprive the father of his legal and moral obligation to care for and support his children, the mother having no adequate means of furnishing the child adequate support.

"It is true that in the Freeman case the divorce decree contained no provision for support of the child. We hold that the rule applies also where the decree provides that the mother shall support the child, if the proof shows also that she is unable or for any reason has failed or refused to furnish adequate support for the child."

When, however, the mode of taking care of the child shows only a resort to the harsh remedies of the criminal law without any showing of reasons not to pursue the civil remedies, we think, in a case such as this where the evidence of destitution and need is so minimal, the element of wilful neglect also has not been proved.

Thus, in Johnson v. State, 22 Ala.App. 160, 113 So. 480, we find:

"This statute was never intended to make the criminal law an instrument for the enforcement of a civil liability in favor of the mother nor indeed could it do so under the Constitution. Its purpose is to protect the public. When a man has children who by his own contract or by order of the court have been placed in the custody of a third person who agrees to care for and support them, and so far as he knows such children are being so cared for, it cannot be said that he has willfully neglected them. If A sends his minor children to B, under an agreement, either expressed or implied, that B will support them, and B does so, A cannot be convicted on a charge of desertion or willful neglect, although a civil obligation may run to B as against A. So, in this case, the children are not being neglected, nor are they in want. Whatever liability there is runs to the mother as against defendant on his common-law duty to support his children, but under this evidence he cannot be convicted of willful neglect."

A number of courts have tried to establish guidelines as to "destitute or necessitous circumstances." See 23 Am.Jur.2d Desertion and Nonsupport, § 59.

In Moorman v. State, 129 Miss. 864, 93 So. 368, we find "left in extreme want or without means of securing the reasonable actual necessities of life."

In other cases the yardstick is not objective (i. e., measured by a general standard), but subjective (i. e., measured by the needs of the particular person). State v. Waller, 90 Kan. 829, 136 P. 215, 49 L.R.A., N.S., 588.

Altogether we do not think that a criminal statute can prescribe one standard for rich and another for the poor. If a wife or child feel—after having the basic necessities—they are being lowered below their raising, a court of equity is the forum. Its powers of contempt are formidable. State v. Worthington, supra.

■ Though the dependent need not be forced to the brink of starvation, nevertheless, under the nonsupport statute, the State should prove the wife or child is in economic need. Good health and nutrition are entitled to preventive maintenance. State v. Brown, 259 Minn. 284, 107 N.W.2d 47.

The judgment below is due to be reversed and the cause remanded.

Reversed and remanded.