MADDOX, Justice
(concurring in part; concurring in the result in part; and dissenting in part).
I concur in Part II; I dissent from Part III.A; and I concur in the result as to Part III.B. Although I agree that one adjudicated to be the father of a child should be permitted to attempt to reopen the paternity adjudication if he has scientific evidence indicating that he is not the father, I cannot agree with the main opinion’s discussion of the separation of powers provision of the Alabama Constitution or with the conclusion that the Legislature was without the constitutional power to provide for the reopening of a judgment of paternity that became final before the effective date of § 26-17A-1 — April 26,1994.[17] I write specifically to state why I believe the Legislature, as the policy-making branch of government, can adopt measures that address changing societal needs in the area of family law, an area of the law that determines so many rights and responsibilities growing out of the parent-child relationship.
The decision to vest in individual judges the sole discretion to determine the ultimate question of which judgments of paternity can be reopened might have been the better policy choice, but it is not the choice that the Legislature made, ánd, except where rights and responsibilities have become vested under a prior paternity judgment, I see absolutely no separation of powers problem. On the contrary, I can see tremendous problems that could be created if a man is forced to support and educate a child that the whole world knows is not his.
This case, unfortunately, is merely symptomatic of the myriad problems that have been caused by an increasingly prevalent immorality and the breakdown of the traditional nuclear family. The breakdown of the nuclear family has caused millions of American children to spend at least some part of their lives in an alternative family arrangement, an arrangement that too often is not an adequate substitute for a stable nuclear family. The arguments made in support of the welfare of these displaced children, many of whom are illegitimate, as is the case here,[18] are very persuasive, but the Legislature has determined that a man who can scientifically show that he is not the father of a child should be allowed to do so and thereby cut off any further parental obligations and responsibilities and any rights of inheritance.
Illegitimate births, such as the one that is the subject of this case, have caused problems throughout history. At common law, illegitimate children were considered to be nonpersons, and the law developed a presumption of legitimacy if a man was married to the mother of the child at the time of conception. As the number of illegitimate *662 births increased, however, there was a concomitant rise in the capacity of science to determine who, in fact, was the father of a child.
Because the breakdown of the nuclear family and the rise in the number of illegitimate children occurred at the same time that scientific testing was improving, several policy questions were presented. One of these questions was the appropriateness of continuing to apply the principle of law that tends to legitimate children, if possible. For several years now, this Court, the Court of Civil Appeals, the trial courts, and indeed the other branches of government, both state and federal, have increasingly been called upon to help address the questions that arise when there is a question whether a particular child is the product of a particular marriage.
For some time I have been troubled by the application of the common law presumptions of legitimacy that a majority of this Court has applied in paternity proceedings, and I have dissented in some of those cases,[19] the most recent being Ex parte W.J., 622 So.2d 358 (Ala.1993), in which I stated that the petitioner there should not have been required to support a child that scientific tests conclusively showed was not his child. Justice Houston also dissented in that case, stating:
“The ‘truth,’ as we now know it, is that W.J. is not the biological father of G.J.’s minor child. This has been recognized by all. There are no disputed facts from which the trier of the facts must ascertain truth. In this case, truth is a given; and the truth is that W.J. is not the biological father of G.J.’s minor child. Should we hold that the trial court abused its discretion in determining that truth should not be time-barred and ruling that W.J. was not legally responsible to continue to reimburse the state? I think not.”
622 So.2d at 364.
Although I do not know whether the Legislature, in adopting Act No. 94-633, Acts 1994, now codified as § 26-17A-1, was responding to this Court’s holding in W.J., I do know that the power of the Legislature is plenary, and I believe this plenary power enables the Legislature to correct what it might perceive to be an injustice of requiring a man to support a child that he did not sire, but that was apparently the product of an adulterous relationship. The legislative branches of both the State and the Federal Government have attempted to address the problems created by the breakdown of the nuclear family, and no one should be allowed to question the rights of government to require fathers to support their children. These exercises of plenary power should not be so circumscribed that the Legislature could not adopt a statute that would allow a man to reopen a paternity judgment under certain circumstances, as the Legislature did in this case. In the remainder of this opinion I will show, after stating some of the history of the presumption of legitimacy, why I think the Legislature had the power to do what it did.
Historically, courts determined paternity based on a presumption that a child born during a marriage, provided that access to the husband at the time of conception was not impossible, was legitimate and the child was a child of the husband, whether that was true or not. This presumption was based on the policy of the law to confer legitimacy upon children whenever possible, and it was applied even in cases where the wife was guilty of infidelity during the possible period of conception. The strict rule of the common law was eventually relaxed and repudiated, or at least greatly modified, and it ultimately gave way to the modern doctrine that the presumption of paternity may be rebutted by competent and relevant evidence showing that the husband could not have been the father of the child. See Arthur v. Arthur, 262 Ala. 126, 77 So.2d 477 (1955). Indeed, those are the facts in this case. Here, M.A.B. has shown by competent and relevant evidence that he could not have been the father of J.B.
*663 In analyzing whether the Legislature had the power to require the reopening of a paternity judgment in certain factual settings, I am guided first by the well-established principles that duly enacted statutes are presumed to be constitutional and that this Court should sustain a statute “unless it is clear beyond reasonable doubt that it is violative of the fundamental law.” Alabama State Federation of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944). After considering § 26-17A-1 and the distinctive subject matter that statute addresses, I am not convinced beyond a reasonable doubt that the Legislature exceeded its authority when it attempted to modify Alabama domestic relations law.
In analyzing the separation of powers issue, the main opinion relies heavily on Plaut v. Spendthrift Farm, Inc., 514 U.S. 211, 115 S.Ct. 1447, 131 L.Ed.2d 328 (1995). However, in Plant, the rights of parties to the judgment had become vested, and the judgment at issue was not a judgment that determined future rights and responsibilities of a parent and rights of inheritance that had not become vested. The statute in question in Plaut was Congress’s response to Lampf, Plena, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). Before the entry of the judgment in Lampf, there was not a national statute of limitations governing federal securities fraud cases; in general, the statute of limitations for such actions was borrowed from a comparable state statute of limitations. In Lampf, the United States Supreme Court established that the limitations period applicable to private actions alleging violations of § 10(b) of the Securities and Exchange Act of 1934 and Securities and Exchange Commission Rule 10b-5 was one year after the discovery of the facts constituting the violation or three years after the violation. Plant, 514 U.S. at 214, 115 S.Ct. 1447. As a result of this decision, some private actions that would have been timely under the old statute of limitations were time-barred under the new statute of limitations. In response, Congress amended the Securities and Exchange Act of 1934 to provide that any action that was commenced on or before the date of the Lampf decision and that had been held untimely, based on Plant, but that would have been timely under the old statute of limitations, could be reinstated by the plaintiff. The United States Supreme Court struck down the amendment as a violation of the separation of powers doctrine.
I agree with the Supreme Court’s decision in Plant, given the facts of that case, and I am firmly committed to the doctrine of separation of powers. However, I do not believe Plant is relevant to the peculiar situation this Court must address in this case. In this case, M.A.B. was erroneously adjudicated to be the father of a child, in all probability because he was married to the child’s mother and the common law presumption of legitimacy was applied. M.A.B. was required to make continuing child support payments based on that adjudication, and he could have been held in contempt of court for his failure to do so. The basic question is whether he should continue to have to support that child when it is possible to show conclusively that he is not the child’s father. In my opinion, this is primarily a question of public policy, and the Alabama Legislature has provided a procedure for reopening such adjudications.
A majority of this Court concludes that the Legislature was without power to authorize one adjudicated to be the father of a child to reopen the adjudication if it was made before the effective date of the Act. I do not share that view, and I believe the majority errs in its logic. My domestic relations professor in law school often stated, “When you are dealing with domestic relations you have to get down a different set of books.” My professor was right. Cases involving family law in general, and paternity adjudications in particular, are equitable in nature and most judgments based on that law are modifiable when circumstances change. Cf. Hartigan v. Hartigan, 272 Ala. 67, 128 So.2d 725 (1961) (stating that a provision in a divorce judgment requiring periodic payments of alimony is not final in the sense that it cannot be changed, and that a court may modify provisions requiring periodic payments of alimony upon proof of a change in conditions). I realize, of course, that in Hartigan this Court exercised its equitable powers to set aside the prior adjudication; however, does that *664 mean that the Legislature is without power to do so? I think the Legislature has that power, except as to rights that have become vested, such as child support payments previously made.
I recognize the importance of a paternity adjudication and the effect such an adjudication has on the future rights of a child as to support and maintenance and as to inheritance. Because paternity adjudications affect so many rights of a parent and child, they affect the public interest, more so now than when the nuclear family was more intact. Because of that fact, the Legislature has within its plenary power the power to make the policy choices it deems necessary and proper to protect those public interests, including the power to reopen a past adjudication of paternity. Cf. Hartigan, 272 Ala. at 67, 128 So.2d at 728 (explaining that divorce actions have a tripartite character, with the public occupying, in effect, the position of a third party).
In short, I believe that the Legislature, in adopting § 26-17A-1, recognized two things: (1) the changing circumstances that exist in today’s society regarding the traditional nuclear family and (2) the advent of accurate scientific tests that can show paternity with certainty. In the context of these recognitions, the Legislature obviously balanced the interests of the child against the interest of the person adjudicated to be the father and concluded that a man should not be forced to continue to pay support for a child that he could scientifically prove was not his.
I have always personally believed that there was something wrong with requiring a man, against his will, to support a child that he did not father, especially when the child is the result of his wife’s unfaithfulness.[20]
Based on the foregoing, I conclude that the Legislature did not violate the Constitution by adopting § 26-17A-1, but that it merely determined, as a matter of public policy, that one adjudicated to be the father of a child may reopen the paternity case if he can present scientific evidence indicating that he is not the father. Consequently, I believe the trial court properly reopened this paternity adjudication under § 26-17A-1, and I must respectfully disagree with the holding to the contrary.

. The statute in question reads:
" § 26-17A-1. Reopening of paternity case.
"(a) Upon petition of the defendant in a paternity proceeding where the defendant has been declared the legal father, the case shall be reopened if there is scientific evidence presented by the defendant that he is not the father. The court shall admit into evidence any scientific test recognized by the court that has been conducted in accordance with established scientific principles or the court may order a blood test, or a Deoxyribose Nucleic Acid test of the mother, father, and child. Whenever the court orders a test and any of the persons to be tested refuse to submit to the test, the fact shall be disclosed at the trial, unless good cause is shown.
"(b) The test shall be made by a qualified expert approved by the court. The expert may be called by the court or any party as a witness to testify to the test results and shall be subject to cross-examination by the parties. The test results may be admitted into evidence. If more than one test is performed and the results are conflicting, none of the test results shall be admissible as evidence of paternity or nonpaternity.
"(c) Compensation of the expert witness shall be paid by the petitioner.
"(d) In the event the child has been adopted the matter of paternity may not be reopened under this chapter.”
This provision is followed by § 26-17A-2, which provides:
"In any decree setting aside an order of paternity pursuant to this chapter, there shall be no claim for damages against the court rendering the initial order of paternity nor any reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State."
(Emphasis added.)

. When I use the term "illegitimate” I refer not only to a child born out of wedlock, but also to a child born in wedlock but fathered by a man who is not the mother's husband. See, Leonard v. Leonard, 360 So.2d 710 (Ala.1978).

. For example, in Leonard v. Leonard, 360 So.2d 710 (Ala.1978), I dissented because the evidence clearly showed that the children in that case were illegitimate. In Ex parte Presse, 554 So.2d 406 (Ala.1989), I dissented because the evidence clearly showed that the child that was the subject of that proceeding was illegitimate.

. The question whether the Legislature has the power to impact the payments and other obligations already fulfilled by the man adjudicated to be the father is not raised in this case. In § 26-17A-2, the Legislature specifically stated that a man who successfully obtains relief from a prior paternity adjudication under § 26-17A-1 may not make a claim for reimbursement or recoupment of money or damages against the mother, the State, or any employee or agent of the State. In other words, § 26-17A-1 cannot affect a prior paternity judgment insofar as it relates to money already paid to and received by the mother, because there can be no reimbursement or recoupment of money from the mother or other damages against her. K.M. v. G.H., 678 So.2d 1084 (Ala.Civ.App.1995), cert. denied, — U.S. ——, 117 S.Ct. 511, 136 L.Ed.2d 401 (1996).